UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Dustin Shirley,

    Plaintiff,

v.                                            Case No. 2:21-cv-13007

Rocket Mortgage,                         Sean F. Cox
                                                           United States District Court Judge

    Defendant.

_____/

**OPINION AND ORDER**
**GRANTING DEFENDANT'S MOTION TO COMPEL ARBITRATION**
**AND**
**DENYING DEFENDANT'S MOTION TO DISMISS AS MOOT**

In this putative class action, Plaintiff Dustin Shirley ("Shirley") alleges that Defendant Rocket Mortgage, LLC ("Rocket Mortgage") violated the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, *et seq.*, by texting his cellphone while his phone number was on the National Do-Not-Call Registry. The matters currently before the Court are Rocket Mortgage's Motion to Compel Arbitration and Dismiss the Complaint (ECF No. 9) and Rocket Mortgage's Motion to Dismiss Plaintiff's First Amended Complaint (ECF No. 21). The motions are fully briefed, and a hearing was held on June 23, 2022. For the reasons set forth below, the Court:

(1) GRANTS Defendant's Motion to Compel Arbitration and Dismiss the Complaint (ECF No. 9);

(2) DENIES Defendant's Motion to Dismiss Plaintiff's First Amended Complaint as moot (ECF No. 21); and

(3) DISMISSES this action in its entirety.

1

**BACKGROUND**

On December 27, 2021, Shirley initiated this putative class action on behalf of himself and others similarly situated. (ECF No. 1). On February 28, 2022, Rocket Mortgage filed its Motion to Compel Arbitration and Dismiss the Complaint. (ECF No. 9). On that same day, Rocket Mortgage filed its Motion to Dismiss Plaintiff's Complaint pursuant to FED. R. CIV. P. 12(b)(6). The Court allowed Shirley to file an amended complaint in response (ECF No. 11), and on March 24, 2022, Shirley filed his First Amended Class Action Complaint (ECF No. 14). As such, that pleading superseded the original complaint, and rendered Rocket Mortgage's motion to dismiss moot. (ECF No. 15). On April 7, 2022, Rocket Mortgage filed its Motion to Dismiss Plaintiff's First Amended Complaint pursuant to FED. R. CIV. P. 12 (b)(6). (ECF No. 21).

In the Amended Complaint, Shirley alleges two TCPA claims: (1) "Violations of the TCPA (47 U.S.C. § 227, et seq. and 47 C.F.R. § 64.1200(c)(2) & (d)(3))" (Count I); and (2) "Willful Violations of the [TCPA], (47 U.S.C. § 227, et seq. and 47 C.F.R. § 64.1200(c)(2) & (d)(3))" (Count 2).

Shirley alleges that his cellular number has been registered with the National Do-Not-Call Registry since February 19, 2013. (ECF No. 14, at PageID 238). Shirley uses his cellular telephone as his residential telephone number. (ECF No. 14, at PageID 238).

On August 15, 2021, Shirley visited LowerMyBills.com ("LMB") seeking mortgage refinance information for a property he owned. LMB's General Counsel described the company as follows:

> LMB operates a free online financial resource center for consumers, and also offers a free referral service for consumers seeking home mortgage and refinance loans. As part of its free referral service for home mortgage financing, LMB identifies consumers who have indicated they are interested in or inquired about home

2

> mortgage or refinance loan options through LMB's website, LowerMyBills.com. LMB will then match consumers to one or more mortgage loan providers, such as Rocket Mortgage, LLC ("Rocket Mortgage"). Since prior to August 2021, LMB and Rocket Mortgage (f/k/a Quicken Loans, LLC) have been affiliated companies, and shared the same parent company, RKT Holdings, LLC.

(ECF No. 9-4, at PageID 88). While on the LMB website, Shirley entered his name, phone number, email, and property address. (ECF No. 9-4, at PageID 90). LMB's business records "demonstrate the Shirley clicked a submission button confirming that he consented and agreed to LMB's Terms of Use on two separate occasions[.]" (ECF No. 9-4, at PageID 91). LMB's Terms of Use included an arbitration clause, which stated in all capital letters:

> You understand and agree that all claims, disputes or controversies between you and LMB, and its parents, affiliates, subsidiaries or related companies, including but not limited to tort and contract claims, claims based upon any federal, state or local statute, law, order, ordinance or regulation, and the issue of arbitrability, shall be resolved by final and binding arbitration at a location determined by the arbitrator. Any controversy concerning whether a dispute is arbitrable shall be determined by the arbitrator and not by the court. Judgment upon any award rendered by the arbitrator may be entered by any state or federal court having jurisdiction thereof. This arbitration contract is made pursuant to a transaction in interstate commerce and its interpretation, application, enforcement and proceedings hereunder shall be governed by the Federal Arbitration Act ("FAA"). Neither you nor LMB shall be entitled to join or consolidate claims in arbitration by or against other consumers or arbitrate any claim as a representative or member of a class or in a private attorney general capacity. The parties voluntarily and knowingly waive any right they have to a jury trial.
>
> The parties agree that this agreement has been entered into at all LMB's place of business in the county of Los Angeles, State of California, and any arbitration, legal action or proceeding arising out of or relating to this agreement must be commenced and take place in the county of Los Angeles, State of California.

(ECF No. 9-6, at PageID 117-118). After agreeing to LMB's Terms of Use, Shirley also clicked the button that he agreed to Rocket Mortgage's Terms of Use, which also contained an arbitration provision, which stated in capital letters:

3

> Your use of this application and your transactions conducted with the company in connection with this application are subject to the following terms and conditions, also referred to as "terms of use". Clicking onto pages beyond the application's homepage constitutes your acceptance and agreement with the terms of use whether or not you complete a transaction with the company and whether or not you complete your transaction on the application or through other channels, such as by phone, by email, facsimile or otherwise. If you do not agree to the terms of use, you may not use this application.

(ECF No. 9-3, at PageID 72).

In the Amended Complaint, Shirley alleges that in or around the summer of 2020, Shirley advised Rocket Mortgage that he was not interested in its services. (ECF No. 14, at PageID 238). However, Rocket Mortgage "initiated repeated telephone solicitations to [Shirley's] cellular telephone by placing calls and sending repeated text messages marketing, advertising and promoting [Rocket Mortgage's] business and services." (ECF No. 14, at PageID 238).

The following is an example of one of the text messages sent to Shirley's cellular telephone: "Rocket Mortgage: You can make a 20% down payment. But should you? Call us today at (888) 980-3075 to find out! Reply HELP for help, STOP to end texts." (ECF No. 14, at PageID 239).

Shirley states that on November 23, 2021, Shirley messaged "Stop" in response. (ECF No. 14, at PageID 239). However, Rocket Mortgage did not cease sending him messages. (ECF No. 14, at PageID 239). Instead, Shirley alleges that Rocket Mortgage "deliberately programmed its telephone dialing systems to continue sending telemarketing messages to consumers for more than three weeks after receiving a 'Stop' request." (ECF No. 14, at PageID 239). Rocket Mortgage sent Shirley at least eleven additional telemarketing text messages from November 29, 2021 until December 16, 2021. (ECF No. 14, at PageID 239-240).

**STANDARDS OF REVIEW**

The FAA provides that a written arbitration provision contained in a "contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract[.]" 9 U.S.C. § 2. The FAA reflects both a "liberal federal policy favoring arbitration, and the fundamental principle that arbitration is a matter of contract." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (citing *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983) and *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010)). The Supreme Court has explained that "courts must place arbitration agreements on an equal footing with other contracts and enforce them according to their terms." *AT&T*, 563 U.S. at 339.

Federal courts apply state law to determine whether contract defenses may invalidate arbitration agreements. *See Doctor's Associates, Inc. v. Casarotto,* 517 U.S. 681, 687 (1996). Federal substantive law, however, governs questions pertaining to the interpretation and construction of arbitration agreements. *Moses A. Cone*, 460 U.S. at 25. The burden is on the party opposing arbitration to show that the agreement is not enforceable. *Green Tree Financial Corp.-Alabama v. Randolph*, 531 U.S. 79 (2000).

**ANALYSIS**

**I.      Motion to Compel Arbitration and Dismiss the Complaint (ECF No. 9)**

Rocket Mortgage argues that the texts Shirley received:

> were sent in response to Shirley's online submission of his contact information and consent to receive text messages as a part of his request for mortgage refinance information from Rocket Mortgage (and others). As a part of that submission,

5

> Shirley repeatedly agreed, among other things, to arbitrate all claims against Rocket Mortgage arising out of his submission.

(ECF No. 9, at PageID 38). Rocket Mortgage contends that Shirley has violated those arbitration agreements by filing this lawsuit, and it asks the Court to enforce the arbitration agreements and compel Shirley's individual claim to arbitration. (ECF No. 9, at PageID 38). Shirley argues that "[b]ecause the website fails to provide inquiry of constructive notice of either the LMB or Rocket Mortgage Terms of Use or the arbitration clauses contained therein, there is not an arbitration agreement for Rocket Mortgage to enforce[.]" (ECF No. 13, at PageID 232). Therefore, the Court must address whether the parties agreed to arbitrate.

"When asked by a party to compel arbitration under a contract, a federal court must determine whether the parties agreed to arbitrate the dispute at issue." *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000). "Courts are to examine the language of the contract in light of the strong federal policy in favor of arbitration. Likewise, any ambiguities in the contract or doubts as to the parties' intentions should be resolved in favor of arbitration." *Id*. The "initial burden is on the party seeking to enforce the agreement to produce a written, signed document." *GGNSC Louisville Hillcreek, LLC v. Estate of Bramer by and through Bramer*, 932 F.3d 480, 484 (6th Cir. 2019). Here, Rocket Mortgage has provided the Court with both LMB's and Rocket Mortgage's Terms of Use, which both included a mandatory arbitration provision. (*See* ECF No. 9-4, at PageID 88 and ECF No. 9-3, at PageID 72). The question at issue is whether Shirley agreed to Rocket Mortgage's and LMB's Terms of Use.

In determining whether the parties have agreed to arbitrate a particular dispute, federal courts apply state-law principles of contract formation. *See First Options of Chicago, Inc. v.*

6

*Kaplan*, 514 U.S. 938, 944 (1995). The parties agreed at the hearing that California state-law applies to the issue of contract formation in this case.

"While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract[,]" including the "requirement of mutual manifestation of assent, whether by written or spoken word or by conduct[.]" *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (applying California law).

> Internet users can form contracts online in a variety of different ways, for example, by clicking on an "I agree" box after being presented with the website's list of terms and conditions of use ("clickwrap" agreements), by using a website that has its terms and conditions of use posted on the website via hyperlink at the bottom of the screen ("browsewrap" agreements), or by signing up for a website account or service in which the user is told that continued use will act as a manifestation of the user's intent to be bound by various terms ("hybrid design" or "modified clickwrap" agreements).

*Maree v. Deutsche Lufthansa AG*, Case No. SACV 20-885-MWF, 2021 WL 267853 at *3 (C.D. Cal. Jan 26, 2021). "Parties traditionally manifest assent by written or spoken word, but they can also do so through conduct." *Berman v. Freedom Financial Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022). "However, the conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents." *Id*. (citing Restatement (Second) of Contracts § 19(2) (1981)). These principles of contract formation apply to contracts formed online. *Id*. at 855-856. "Thus, if a website offers contractual terms to those who use the site, and a user engages in conduct that manifests her acceptance of those terms, and enforceable agreement can be formed." *Id*. at 856.

Courts have routinely found "clickwrap" agreements enforceable because by checking a box explicitly stating "I agree" in order to proceed, the "consumer has received notice of the terms being offered and, in the words of the Restatement, "knows or has reason to know that the other

7

party may infer from his conduct that he assents" to those terms." *Id*; *see also Meyer v. Uber Technologies, Inc.*, 868 F.3d 66, 75 (2d Cir. 2017). However, courts are "more reluctant to enforce 'browsewrap' agreements" because in those agreements, the website only offers terms that are "disclosed through a hyperlink and the user supposedly manifests asset to those terms simply by continuing to use the website." *Id*. With browsewrap agreements, "consumers are frequently left unaware that contractual terms were even offered, much less that continued use of the website will be deemed to manifest acceptance of those terms." *Id*. (citing *Ngyuyen*, 763 F.3d at 1178).

The Ninth Circuit recently explained how to determine whether a consumer gave meaningful assent in such online contracts:

> Unless the website operator can show that a consumer has actual knowledge of the agreement, an enforceable contract will be found based on an inquiry notice theory only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms. *See Meyer*, 868 F.3d at 75; *Nguyen*, 763 F.3d at 1173 (refusing to enforce an arbitration provision to which the consumer "did not unambiguously manifest assent").

*Berman*, 30 F.4th at 856.

**A. Actual Knowledge**

The parties do not substantively address actual knowledge in their briefs. In Shirley's response, he argues that "Rocket Mortgage argues only that Plaintiff was on inquiry notice of the LMB and Rocket Mortgage Terms of Use, not that Plaintiff had any actual notice of the terms . . ." (ECF No. 13, at PageID 222). In its reply, Rocket Mortgage argues that Shirley had "actual notice of the Terms of Use and twice affirmatively agreed to them by clicking the 'Calculate' and 'Calculate your FREE results' buttons." (ECF No. 25, at PageID 396).

Courts have found that parties to online agreements have actual knowledge when the parties either admit they had knowledge or where they were notified of the terms in a subsequent letter and continued to use the website. The Second Circuit found a likelihood of success on the merits in a breach of browsewrap claim where the defendant "admitted that . . . it was fully aware of the terms" of the offer. *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 401-04 (2d Cir. 2004). The Northern District of Texas found that there was proper contract formation where the defendant continued its breach after being notified of the terms in a cease-and-desist letter. *Sw. Airlines Co. v. BoardFirst, LLC*, Case No. 3:06-cv-0891-B, 2007 WL 4823761, at *4-6 (N.D. Tex. Sept. 12, 2007); *see also Ticketmaster Corp. v. Tickets.Com, Inc.*, No. CV-997654, 2003 WL 21406289, at *2C (C.D. Cal. Mar. 7, 2003). Here, the parties have not presented evidence that Shirley had actual knowledge of the Terms of Use via either admission or an alternate source.

**B. Inquiry Notice**

Therefore, the Court must analyze whether Shirley had inquiry notice, which is established if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms. *See Berman*, 30 F.4th at 856.

Here, Rocket Mortgage provided a helpful video of the website's functionality at the time Shirley accessed it. (Filed in the traditional manner as Exhibit 2A to ECF No. 25). Rocket Mortgage also played the video at the hearing. The video demonstrates how a user would navigate through LMB's website on an iPhone as Shirley did. The video shows that after a user answers a series of questions regarding refinancing, the user is required to click a green "Calculate" button, under which is an advertisement and directly under the advertisement is a hyperlink to both Rocket

9

Mortgage and LMB's Terms of Use in underlined grey text. Once the user clicks the green "Calculate" button, the user moves on to the next page, and the user answers another series of refinancing questions and provides personal information. To move onto the next page, the user must click another green "Calculate" button, directly under which states:

> By clicking on the button above, you agree to be contacted by LowerMyBills, at the address entered above for promotional emails and consent, electronically via E sign, to the LMB Lending Terms of Use, Privacy Policy, and Consent to Doing Business Electronically.

The above text is in grey, except for the hyperlinks to the Terms of Use and Privacy Policy, which are underlined and in blue. On the next page, the user inputs more personal information, including his name, address, and phone number. To move on to the next page, users need to click a green "Calculate your FREE results" button. Directly under this button, it states:

> By clicking the button above, you express your understanding and consent electronically via E sign to the following:
>
> . . .
>
> To the LMB Lending Terms of Use Privacy Policy and Consent to Doing Business Electronically.
>
> . . .

The text block is grey except the hyperlinks, which are underlined and in blue, including the hyperlink to the Terms of Use, which includes the mandatory arbitration provision.[1]

In short, Shirley clicked three buttons. Under the first button, grey and underlined hyperlinks to LMB's and Rocket Mortgage's Terms of Use appeared below an advertisement.

---

[1] The LMB website appears to offer a type of hybrid online agreement: it is somewhere in between the clickwrap agreements where a user is presented with terms and affirmatively clicks an "I agree" button and the browsewrap agreements where the website's terms are provided to users via a hyperlink at the bottom of a webpage and a user's assent to the terms is assumed by her continued use of the website. *See Maree*, 2021 WL 267853 at *3.

10

Under the second and third buttons, a blue and underlined hyperlink to LMB's Terms of Use appeared directly beneath the buttons.

*Reasonably conspicuous notice*. "[T]o be conspicuous in this context, a notice must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it." *Berman*, 30 F.4th at 856 (citing *Nguyen*, 763 F.3d at 1177).

Shirley argues that the grey text is "dwarfed and overshadowed by the much larger colorful green button" and the website "would lead consumers to click the vibrant 'Calculate' or 'Calculate your FREE results' buttons while never knowing that the below disclaimers are significantly smaller, barely-legible font subjects them to LMB and Rocket Mortgage Terms of Use." (ECF No. 13, at PageIDs 225, 227-28). Shirley relies on *Shultz v. TTAC Publ'g, LLC*, Case No. 20-cv-04375-HSG, 2020 WL 6937818, at *3 (C.D. Cal. Oct. 26, 2020), which held that a hybrid browsewrap agreement was not conspicuous. However, the website in *Shultz* is distinguishable from LMB's website in several ways.

While the *Shultz* website is similar in that the phrase "I agree to the terms and conditions" was in grey text underneath a green button, the *Shultz* website also had a promotional video playing the top left corner of the webpage at maximum volume level and next to the terms and conditions hyperlink there were advertisements with several large green checkmarks, which "obscure[d] the import of the checkmark beside the hyperlink." *Shultz*, 2020 WL 6937818, at *4. On the *Shultz* website, the hyperlink to the terms was in blue, but it was not underlined. *Id*. In concluding that the terms were not conspicuous, the *Shultz* court cited *Wilson v. Huuuge, Inc.*, 944 F.3d 1212, 1221 (9th Cir. 2019), which noted that courts often decline to enforce agreements that require users to "parse through confusing or distracting content and advertisements." Here, while the grey text with

11

the blue and underlined hyperlinks to LMB's Terms of Use was smaller than the green "Calculate" and "Calculate your FREE results" buttons, website users did not have to parse through loud videos, like the users in *Shultz,* nor did "they have to scroll through multiple screen-lengths of similar-looking paragraphs", like the users in *Wilson*.

The Ninth Circuit has explicitly stated that "it is permissible to disclose terms and conditions through a hyperlink" so long as the "a hyperlink is present must be readily apparent." *Berman*, 30 F.4th at 857.

> A web designer must do more than simply underscore the hyperlinked text. Customary design elements denoting the existence of a hyperlink include the use of a contrasting font color (typically blue) and the use of all capital letters, both of which can alert a user that the particular text differs from other plain text in that it provides a clickable pathway to another webpage. Consumers cannot be required to hover over their mouse over otherwise plain-looking text or aimlessly click on words on a page in an effort to 'ferret out hyperlinks.'

*Berman*, 30 F.4th at 857. Here, the first button – under which was both Rocket Mortgage and LMB's Terms of Use – may not comply with this standard because the hyperlinks were not in a different color nor were they in capital letters to distinguish them from the rest of the text. However, the second and third buttons – under which was only LMB's Terms of Use – comply with this standard because the hyperlink to the Terms of Use was underlined and in a blue contrasting color to the rest of the grey text. Therefore, the hyperlink to LMB's Terms of Use was readily apparent to a reasonably prudent Internet user. A user of the website (such as Shirley) would clearly see the hyperlinks directly below the second and third buttons before he clicked on them. As such, the Court finds that LMB's notice of terms was conspicuous such that a reasonably prudent Internet user would have seen it.

*Unambiguous manifestation of assent*. When determining whether a website user unambiguously assented to an online agreement, "[t]he presence of 'an explicit textual notice that continued use will act as a manifestation of the user's intent to be bound' is critical to the enforceability of any browsewrap-type agreement." *Berman*, 30 F.4th at 857 (quoting *Nguyen*, 768 F.3d at 1177). "A user's click of a button can be construed as an unambiguous manifestation of assent only if the user is explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement." *Id*.

Here, Shirley clicked three buttons. Under the first button, there was no explicit textual notice with Rocket Mortgage's and LMB's Terms of Use. Therefore, the first button may not indicate a user's unambiguous manifestation of assent. However, under the second and third buttons, there was an explicit textual notice that said "By clicking the button above" the user agreed to LMB's Terms of Use. This is analogous to the online agreement in *Lee v. Ticketmaster, LLC*, 817 Fed. App'x 393, 394-95 (9th Cir. 2020), which the Ninth Circuit found that the user validly assented to the terms of use:

> Lee validly assented to Ticketmaster's Terms of Use, including the arbitration provision, each time he clicked the "Sign In" button when signing into his Ticketmaster account, where three lines below the button, the website displayed the phrase, "By continuing past this page, you agree to our Terms of Use," as well as each time he clicked the "Place Order" button when placing an order for tickets, where directly above the button, the website displayed the phrase, "By clicking 'Place Order,' you agree to our Terms of Use," where in both contexts, "Terms of Use" was displayed in blue font and contained a hyperlink to Ticketmaster's Terms.

*Id*. This is similar to Shirley clicking the second and third buttons because they came with a notice directly underneath them that stated by continuing to click the buttons, Shirley was agreeing to LMB's Terms of Use.

Therefore, the Court finds that Shirley unambiguously manifested his assent to LMB's Terms of Use by clicking the second and third buttons.

Rocket Mortgage's Terms of Use were only under the first button, which as stated above, may not meet the requirements for inquiry notice. However, at the hearing, Shirley stated that he agrees that Rocket Mortgage can enforce LMB's arbitration agreement with Shirley as an intended third-party beneficiary.

In sum, the Court finds that Shirley had inquiry notice of LMB's Terms of Use and holds that the mandatory arbitration provision contained within those Terms of Use are enforceable. As such, the Court GRANTS Rocket Mortgage's motion to compel arbitration (ECF No. 9). Because Shirley does not dispute that his claims pled in this case fall within the scope of the arbitration agreement, the Court DISMISSES this action.

## II. Motion to Dismiss the Amended Complaint (ECF No. 21)

In light of the findings above, the Court DENIES Rocket Mortgage's motion to dismiss (ECF No. 21) as moot.

## CONCLUSION

For the reasons explained above:

(1) Defendant's Motion to Compel Arbitration and Dismiss the Complaint (ECF No. 9) is **GRANTED**;

(2) Defendant's Motion to Dismiss Plaintiff's First Amended Complaint (ECF No. 21) is **DENIED** as moot; and

(3) this action is **DISMISSED**.

**IT IS SO ORDERED.**

s/Sean F. Cox
Sean F. Cox
United States District Judge

Dated: July 7, 2022